UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| PHILLIP SABA ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil No. 12-1036 (RCL) |
| ) | |
| U.S. DEPARTMENT OF AGRICULTURE, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**MEMORANDUM OPINION**

Plaintiff Phillip Saba filed suit against his employer, the United States Department of Agriculture ("USDA"), alleging multiple counts of discrimination and retaliation, in violation of Title VII of the Civil Rights Act of 1964, the Rehabilitation Act, and the Family and Medical Leave Act. Upon consideration of the defendant's Motion to Dismiss, Or In the Alternative, For Summary Judgment [16], the plaintiff's Opposition thereto [20], and the defendant's Reply [25], the Court will GRANT IN PART and DENY IN PART the defendant's Motion.

**I. BACKGROUND**

Phillip Saba has served as an electrical engineer with the USDA since June 24, 2007. Mr. Saba, who is of Lebanese descent and suffers from severe allergies, alleges that the USDA has engaged in a continual pattern of national origin and disability discrimination and retaliation.

According to Mr. Saba, the pattern began during his employment interview in February 2007, when his interviewer and future supervisor, Louis Riggs, became aware of Mr. Saba's Lebanese origin. Compl. ¶ 7. In response, Mr. Riggs recalled that three decades prior, he had been a passenger on an airplane hijacked by Lebanese nationals. *Id.* Whatever his feelings about

this incident, Mr. Riggs found Mr. Saba the best qualified candidate and offered him the electrical engineer position at the GS-11 level. *Id.* ¶ 8. When Mr. Saba balked at the salary, Mr. Riggs re-offered the position at the GS-13 level. *Id.* Mr. Saba accepted the offer and began work on June 24, 2007. *Id.* ¶ 9.

Within a month of being hired, Mr. Saba informed Mr. Riggs of his severe allergies to dust, mold, dust mites, and pollen, which required weekly injections of allergy medication. *Id.*

On February 12, 2008, Mr. Riggs assigned Mr. Saba to work in a dusty basement that triggered Mr. Saba's allergies. *Id.* ¶ 11. As an accommodation of his medical condition, Mr. Saba requested gloves and a face mask. *Id.* Mr. Riggs denied this request. *Id.*

Mr. Saba alleges that, as retaliation for his accommodation request, Mr. Riggs began a pattern of harassment that included an increase in Mr. Saba's workload and a sustained attempt to paint Mr. Saba as a chronically absent and lackadaisical employee. *Id.* ¶ 14–15. This harassment included calls to Mr. Saba's mobile and home telephone numbers outside of office hours throughout the spring and summer of 2008. *Id.* Mr. Riggs also began to question the veracity of Mr. Saba's justifications for taking personal and sick leave. *Id.* ¶ 18–19. As a result of this "frequent harassment," Mr. Saba requested a transfer to a different division on September 10, 2008. *Id.* ¶ 20.

On September 24, 2008, Mr. Saba submitted a leave request pursuant to the Family and Medical Leave Act in order to care for an ill family member. *Id.* ¶ 21. Mr. Riggs approved the request but made several calls to Mr. Saba's mobile phone while he was on FMLA leave. *Id.*

On October 31, 2008, Mr. Saba received his first performance evaluation. *Id.* ¶ 22. In his written comments, Mr. Riggs noted that "despite being foreign born, [Mr. Saba] was a strong communicator." *Id.* While Mr. Riggs initially declined to rate Mr. Saba as outstanding, he did

so after being confronted with instances of Mr. Saba's leadership initiative and significant contributions to resolving loan applications and contracts. *Id*. Despite the outstanding rating, Mr. Riggs declined to award Mr. Saba a Quality Step Increase ("QSI") in 2008 and 2009. *Id*.

On November 4, 2008, a co-worker informed Mr. Saba that Mr. Riggs improperly shared confidential information learned from a previous employer of Mr. Saba. *Id*. ¶ 23. Mr. Riggs admitted that he shared this information with upper management officials on December 5, 2008. *Id*. ¶ 25.

Still suffering from allergies, Mr. Saba, who already worked from home two days each week, requested an additional telecommute day to reduce his exposure to dust in the office. *Id*. ¶ 26. His request was denied. *Id*. Shortly thereafter, on February 5, 2009, Mr. Riggs instructed Mr. Saba to document the amount of work he completed on his telecommute days. *Id.* ¶ 27. At least two other telecommuting employees were not required to provide such documentation. *Id*.

On February 20, 2009, Mr. Riggs again assigned Mr. Saba to work in the basement. *Id*. ¶ 28. When Mr. Saba complained about his allergies, Mr. Riggs requested a report from Mr. Saba's physician, which Mr. Saba provided on February 24. *Id*. On February 26, Mr. Saba reiterated his request for an additional telecommute day, which was denied during a meeting on March 3, 2009. *Id*. ¶ 30.

On June 26, 2009, Mr. Saba contacted an EEO counselor and alleged discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 and Section 501 of the Rehabilitation Act.

### A. Administrative Process for Title VII and Rehabilitation Act Complaints

Title VII of the Civil Rights Act of 1964 and Section 501 of the Rehabilitation Act prohibit discrimination against federal employees on the basis of national origin and disability,

3

respectively. Employees alleging discrimination in violation of either statute "must initiate contact with an EEO counselor within 45 days of the date of the matter alleged to be discriminatory." 29 C.F.R. § 1614.105(a)(1). After the EEO investigator completes her investigation of the allegations, the employee may demand either an immediate final decision or a hearing before an EEOC administrative judge. 29 C.F.R. § 1614.106(e)(2); 29 C.F.R. § 1614.108(f). Alternatively, if no final decision has been issued within 180 days of the initial complaint, the employee may file a complaint in federal court. 29 C.F.R. § 1614.407. Exhaustion of this administrative process is a prerequisite to any civil action alleging violations of Title VII or the Rehabilitation Act.

### B. Mr. Saba's Administrative Process

At the time of Mr. Saba's initial EEO contact on June 26, 2009, all of the events described above fell outside the 45-day filing limit. The agency nonetheless accepted all of his allegations for investigation. While his complaint was pending throughout 2009 and 2010, Mr. Saba amended his complaint with five timely allegations, namely:

- In May 2009, Mr. Riggs failed to fix a broken cabinet in Mr. Saba's workspace and "forced him to continue working in an unsafe and dusty environment without proper work tools." Def.'s Mot. Summ. J., Ex. 1 (Amendment to Phillip Saba's EEO Complaint, June 24, 2010), at 1 [hereinafter EEO Amend.].
- In June 2009, USDA management falsely accused him of violating the agency's leave policies and improperly called him on his personal mobile phone while he was on family leave.
- After June 2009, management increased surveillance of Mr. Saba and assigned him more responsibilities.
- On September 16, 2009, during a mediation attempt, Cheryl Prejean Greaux, USDA's ADR manager, offered Mr. Saba a transfer in exchange for dropping his EEO complaint and stated that he should not "expect justice." Compl. ¶ 53.
- On April 26, 2010, Mr. Saba learned that while he was denied a QSI in 2008 and 2009, another employee received a QSI in 2010.

On March 22, 2012, after his complaint had been pending for nearly three years, Mr. Saba withdrew from the administrative EEO process and opted to file the instant complaint.

4

Def.'s Mot. Summ. J., Ex. 18 (Order, Mar. 23, 2012), at 1. The complaint alleges five counts: (1) failure to accommodate Mr. Saba's disability under the Rehabilitation Act; (2) retaliation under the Rehabilitation Act; (3) national origin discrimination under Title VII; (4) retaliation under the Family and Medical Leave Act; and (5) national origin discrimination under the Rehabilitation Act.

As only five of Mr. Saba's EEO allegations were timely, and therefore properly exhausted, the USDA has moved to dismiss Mr. Saba's Title VII and Rehabilitation Act claims—Counts I, II, IV, and V. To the extent that these claims survive the motion to dismiss, the government moves the Court for summary judgment. The Court will address the motion to dismiss and the motion for summary judgment in turn.

## II. MOTION TO DISMISS

USDA seeks dismissal of the plaintiff's complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

### A. Legal Standard

A Rule 12(b)(1) motion "presents a threshold challenge to the court's jurisdiction," *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987), and requires dismissal if the plaintiff fails to establish the Court's jurisdiction over the claims alleged in his complaint. By contrast, a Rule 12(b)(6) motion "tests the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). "To survive a [12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted).

The distinction between the two rules is underscored by the differing claims asserted by Mr. Saba—exhaustion of administrative remedies is a jurisdictional requirement under the

Rehabilitation Act, *Spinelli v. Goss*, 446 F.3d 159, 162 (D.C. Cir. 2006), but is merely an affirmative defense under Title VII, *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997). Thus, in order to defeat USDA's motion to dismiss, Mr. Saba must demonstrate that he has exhausted administrative remedies in order to establish jurisdiction for his Rehabilitation Act claims under 12(b)(1) and to successfully state a Title VII claim under 12(b)(6). Because untimely claims cannot be properly exhausted, the timeliness of Mr. Saba's claims is dispositive of whether he can make the necessary showing to survive USDA's motion.

### B. <u>Analysis</u>

Mr. Saba does not dispute that the vast majority of the acts alleged in his complaint were untimely when he first contacted an EEO counselor in June 2009; rather, he argues this untimeliness should be excused for two reasons. The first argument, that the USDA waived the exhaustion defense by accepting all of his claims for investigation, fails because "agencies do not waive a defense of untimely exhaustion merely by accepting and investigating a discrimination complaint," *Bowden*, 106 F.3d at 438. Moreover, with respect to the Rehabilitation Act claims, the exhaustion requirement is jurisdictional and therefore may not be waived. *Uzlyan v. Solis*, 706 F. Supp. 2d 44, 56 (D.D.C. 2010). Mr. Saba's second argument, that he was subject to a hostile work environment, requires a more extensive analysis.

#### i. <u>Hostile Work Environment</u>

For discrete adverse employment actions, such as termination, application of the 45-day time limit is straightforward. By contrast, hostile work environment claims by "[t]heir very nature involve[] repeated conduct" and "are based on the cumulative effect of individual acts." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). Because of the ongoing nature of such claims, the exhaustion requirement is relaxed, and "[p]rovided that an act

6

contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability." *Id*. at 117.

Application of this principle to Mr. Saba's hostile environment claim is complicated by his poorly-drafted complaint. The first paragraph of his complaint alleges that Mr. Saba "has been the subject of continual discrimination in the workplace based on his nationality . . . and . . . disability," Compl. ¶ 1, but none of the formal counts assert a hostile work environment claim. [1] Although this makes the complaint exponentially more difficult to understand and examine, "under the Federal Rules of Civil Procedure, a complaint need not pin a plaintiff's claim for relief to a precise legal theory, and an employment discrimination plaintiff is not required to plead every fact necessary to establish a prima facie case to survive a motion to dismiss." *Jones v. Air Line Pilots Ass'n, Int'l*, 642 F.3d 1100, 1104 (D.C. Cir. 2011) (internal quotations and citations omitted). For the purposes of this motion, and in accordance with the averments and arguments in Mr. Saba's opposition, the Court will construe the complaint as alleging a hostile work environment claim based upon disability, retaliation, and/or national origin. Because five of the acts contributing to the hostile work environment were timely alleged and thus fully exhausted, USDA's motion to dismiss is denied as to this claim.

      ii. Discrete Acts of Discrimination & Retaliation

Aside from the hostile work environment claim, Mr. Saba's complaint formally alleges discrete violations of the Rehabilitation Act and Title VII. USDA argues that Mr. Saba has failed to state a claim as to each of these counts.

       *1. Count I: Failure to Accommodate Disability*

---

[1] Indeed, rather than asserting what Mr. Saba now claims is the gravamen of his case, the complaint formally alleges only discrete violations of the Rehabilitation Act and Title VII. Count I, for example, alleges that USDA violated the Rehabilitation Act by failing to accommodate Mr. Saba's allergies by replacing carpet and granting him three telecommuting days per week, an allegation that clearly falls outside the 45-day time limit.

7

Count I alleges that the USDA violated the Rehabilitation Act by failing to accommodate Mr. Saba's allergies by replacing carpet and granting him three telecommuting days per week. These denials occurred in February 2009 and therefore fall outside the 45-day filing limit. Of the five timely claims, only one is relevant to Mr. Saba's disability—that USDA managers "failed to fix [Mr. Saba's] broken cabinet and required him to continue working in an unsafe and dusty environment without proper work tools." Although the claim references a "dusty environment," Mr. Saba's explanation of this reference makes clear that he is referring to management's denial of his request for accommodation in February 2009. Def.'s Mot. Summ. J., Ex. 2 (Complainant's Affidavit, July 22, 2010), at 7. And a broken cabinet—no matter how dangerous—is plainly immaterial to Mr. Saba's allergy to dust, dust mites, mold, and pollen. Permitting this claim to proceed on this basis would permit Mr. Saba to use a defective cabinet to bootstrap his untimely failure to accommodate claim into his complaint. The Court declines to do so, and Count I of the complaint is dismissed.

2. *Count II: Retaliation Under Rehabilitation Act*

To prove retaliation under the Rehabilitation Act, the plaintiff must plead that he suffered (1) a materially adverse action (2) because he brought or threatened to bring a discrimination claim. *Baloch v. Kempthorne*, 550 F.3d 1191, 1198 (D.C. Cir. 2008). A materially adverse action in the retaliation context differs from adverse employment actions required in Title VII discrimination claims. *Id*. at 1198 n.4. Materially adverse actions are "not limited to discriminatory actions that affect the terms and conditions of employment and may extend to harms that are not workplace-related or employment-related so long as a reasonable employee would have found the challenged action materially adverse." *Id*. (internal quotations omitted).

Mr. Saba's complaint alleges that two of his exhausted claims constitute materially adverse actions: Ms. Greaux's offer to transfer Mr. Saba in exchange for him dropping his EEO complaint and the agency's failure to award Mr. Saba a quality step increase. The first, which occurred during an attempted mediation of his informal EEO complaint, Def.'s Mot. Summ. J. 29, cannot be properly classified as materially adverse. As to the second, because the Court finds that denial of the QSI was an adverse employment action, *see* Section II.B.ii.3, *infra*, the Court also finds that the action fits into the broader category of materially adverse actions sufficient to support a claim of retaliation under the Rehabilitation Act. The defendant's motion is denied as to this count.

### 3. Count III: Discrimination Under Title VII

In order to successfully state a claim of national origin discrimination under Title VII, the plaintiff must plead two elements: "(i) the plaintiff suffered an adverse employment action (ii) because of the [plaintiff's] . . . national origin . . . ." *Brady v. Office of Sergeant of Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008). An adverse employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998). "[N]ot everything that makes an employee unhappy is an actionable adverse action." *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001). Rather, an employee must "experience[] materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002). An objectively

tangible employment action "in most cases inflicts direct economic harm." *Burlington Indus.*, 524 U.S. at 762.

It is not clear from the complaint which of the five exhausted claims Mr. Saba alleges support his Title VII discrimination claim, but clarification is unnecessary because only one of these claims rises to the level of an adverse employment action.

First, Mr. Saba alleges that USDA management "increase[ed] their surveillance of him and assign[ed] him more responsibilities." Courts have consistently held that neither increased scrutiny nor increased workload is an adverse employment action under Title VII. *Lester v. Natsios*, 290 F. Supp. 2d 11, 29–30 (D.D.C. 2003) (collecting cases). Second, Mr. Saba alleges that his supervisors falsely accused him of violating the leave policy and repeatedly called him on his personal mobile phone while he was on sick leave. Annoying as these behaviors may be, they are "purely subjective harms," that do not affect the terms, conditions, or privileges of employment and thus are not adverse employment actions. *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002). The same applies to the statements made during the EEO mediation and Mr. Saba's encounter with the broken cabinet, which are not cognizable employment actions under Title VII.

The denial of the QSI, however, is an adverse employment action. A QSI is a performance-based bonus, which "is a tangible, quantifiable award, more analogous to one's salary or to a benefit of one's employment than to a performance evaluation." *Russell v. Principi*, 257 F.3d 815, 819 (D.C. Cir. 2001). The defendant's citations to cases involving mere nominations for non-monetary awards—*see e.g.*, *Douglas v. Donovan*, 559 F. 3d 549 (D.C. Cir. 2009)—are unavailing. Nomination for written commendation is readily distinguishable from a QSI because "loss of a bonus that is worth hundreds of dollars is not a petty detriment." *Russell*,

257 F.3d at 819. It would be inconsistent with the letter and the spirit of Title VII to allow managers to dole out such substantial awards with discriminatory animus. Of course, it remains for Mr. Saba to establish at trial or in response to a subsequent summary judgment motion that such discrimination was at play in his case, a task sure to be complicated by the facts that Mr. Riggs hired him, lobbied for a higher starting salary, and awarded the sole QSI distributed in recent years to another Lebanese engineer. But, because his complaint states a prima facie case of discrimination under Title VII, the USDA's motion as to this count is denied.

### 4. Count V: National Origin Discrimination Under the Rehabilitation Act

The final count of Mr. Saba's complaint alleges that the USDA discriminated against him on the basis of his Lebanese origin, in violation of the Rehabilitation Act. The count fails to state a claim upon which relief can be granted because the Rehabilitation Act contains no prohibition of national origin discrimination. Accordingly, Count V of the Complaint is dismissed.

### III. MOTION FOR SUMMARY JUDGMENT

Given the dismissal of various claims made the plaintiff, the allegations of a hostile work environment, retaliation under the Rehabilitation Act, national origin discrimination under Title VII, and retaliation under the Family Medical Leave Act are what remains of the complaint. With the exception of the FMLA claim, the defendant, arguing in the alternative, moves the Court for summary judgment as to these remaining counts.

#### A. **Legal Standard**

"[T]he central purpose of the summary judgment device . . . is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial." *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A fact is material if it could affect the outcome of the case. *Anderson*, 477 U.S. at 248. A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. The "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

### B. Analysis

A hostile work environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotations and citations omitted). Key in the Supreme Court's description of a hostile work environment are the terms *severe* and *pervasive*. Unkind, abusive, and even behavior motivated by discriminatory animus may be insufficient to create a legally hostile environment unless it is so *extreme* that it "amount[s] to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998); *see also Stewart v. Evans*, 275 F.3d 1126, 1133 (D.C. Cir. 2002). The Supreme Court has repeatedly cautioned that the standard for finding a hostile work environment must be "sufficiently demanding to ensure that Title VII does not become a general civility code." *Faragher*, 524 U.S. at 788.

With that instruction in mind, the Court finds that Mr. Saba has failed to demonstrate a hostile work environment. The worst of Mr. Saba's allegations—that management subjected him to increased monitoring regarding his job duties, called his personal mobile number for professional inquiries, made an insensitive comment in an otherwise outstanding performance appraisal, and improperly shared confidential information with other upper management

12

officials—are insufficiently extreme, severe, and pervasive to create a hostile work environment under Title VII. At worst, Mr. Saba's complaint demonstrates the "ordinary tribulations of the workplace," which are not actionable under Title VII. *Faragher*, 524 U.S. at 788.

The plaintiff urges the Court to allow his hostile work environment claim to proceed to discovery in order to "strengthen his claims" and uncover "the continual nature of Mr. Rigg's abuse." Pl.'s Opp. 11, ECF No. 20. Because the crucial inquiry in a hostile work environment claim is the effect of the harassment on the plaintiff, *see, e.g.*, *Faragher*, 524 U.S. at 788, additional discovery would not change the outcome of the Court's ruling as it is unlikely that an act heretofore unknown by the plaintiff affected his work performance so severely so as to change the terms and conditions of his employment. The defendant's motion for summary judgment is therefore granted as to the hostile work environment claim.

The same cannot be said, however, regarding the plaintiff's Title VII and Rehabilitation Act claims. Additional discovery on these allegations may allow plaintiff to further develop his claims, and the Court will therefore deny the defendant's motion for summary judgment as to these counts.

## IV. CONCLUSION

In sum, USDA's Motion to Dismiss is granted as to Counts I and V of Mr. Saba's complaint and denied as to the remaining counts and the hostile work environment claim. Summary Judgment is granted on the hostile work environment claim and denied as to all remaining claims. This case shall proceed on the basis of Mr. Saba's allegations that: (1) USDA denied him a QSI in retaliation for his requests for accommodation under the Rehabilitation Act; (2) USDA denied him a QSI because of his national origin in violation of Title VII; and (3) USDA retaliated against him because of his request for family medical leave in violation of the

FMLA.  Finally, because the plaintiff concedes that he failed to name the proper party in his complaint, the Court will grant leave to amend the complaint in order to cure this defect.

A separate Order consistent with this Memorandum Opinion shall issue this date.

Signed by Royce C. Lamberth, United States District Judge, on February 14, 2014.